EXHIBIT A

```
 1                FEDERAL RAND JURY

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                   UY GRAND JURY

 4         DOCKET NO. 012-027-JA-OY4-20-GJ

 5

 6        Proceedings had before the Grand Jury

 7        of the United States of America, in and

 8        for the Central District of California,

 9        at the United States District Courthouse,

10        312 North Spring Street, 13th Floor,

11        Los Angeles, California, commencing

12        at 10:32 A.M., on Tuesday, September 1, 2020.

13

14              D I S C U S S I O N

15

16

17   PRESENT:

18        Ben Balding
          Assistant U.S. Attorney
19

20

21

22   REPORTED BY:  Sheryl Williams, CSR NO. 7453

23

24

25
```

1           LOS ANGELES, CALIFORNIA, TUESDAY, SEPTEMBER 1, 2020

2                              10:32 A.M.

3                               -O0O-

4        MR. BALDING:  This is the case of United States vs.

5   Jorge Ruben Camargo-Clark.  And, again, my name is Ben

6   Balding.  I'm an Assistant United States Attorney here in

7   the central district.

8           I'll read you through the indictment, but first

9   can I have the foreperson confirm there is a quorum.

10       THE FOREPERSON:  There is a quorum present.

11       MR. BALDING:  Thank you.

12          We're now going to go through the indictment.

13  It's an indictment charging one count charging the

14  defendant with a violation of Title 21, United States Code,

15  Section 963, Conspiracy to Distribute Cocaine for the

16  Purpose of Unlawful Importation.  It's brought against

17  Jorge Ruben Camargo-Clark, aka Cool nene, aka el nene, aka

18  Nene.

19          "The Grand Jury charges:

20          "Title 21, United States Code, Section 963

21          "Object Of The Conspiracy

22          "Beginning on a date unknown, and continuing to

23  on or about May 30, 2018, in the country of Panama, and

24  elsewhere, defendant Jorge Ruben Camargo-Clark, also known

25  as Cool nene, el nene, and Nene, conspired with others

1  known and unknown to the Grand Jury to knowingly and
2  intentionally distribute at least five kilograms of a
3  mixture and substance containing a detectable amount of
4  cocaine, a Schedule II narcotic drug controlled substance,
5  intending, knowing, and having reasonable cause to believe
6  that such substance would be unlawfully imported into the
7  United States, in violation of Title 21, United States
8  Code, Sections 959(a), 960(a)(3), and (b)(1)(B)(ii).
9          "Means By Which The object Of The Conspiracy Was
10 To Be Accomplished
11         "The object of the conspiracy was to be
12 accomplish, in substance, as follows:
13         "1.  Defendant Camargo's co-conspirator
14 (Co-conspirator 1) would obtain cocaine in Colombia for the
15 purpose of distribution in the United States and elsewhere.
16         "2.  Defendant Camargo would obtain cocaine from
17 Co-conspirator 1 and arrange with other co-conspirators to
18 transport that cocaine from Colombia to Panama by boat for
19 the purpose of distribution in the United States and
20 elsewhere.
21         "3.  At defendant Camargo's instruction,
22 co-conspirators would transport cocaine from Colombia to
23 Panama and hide the cocaine in Panama.
24         "4.  After the cocaine arrived in Panama from
25 Colombia, defendant Camargo and co-conspirators would

1  transport portions of the cocaine shipment to Costa Rica
2  and ultimately to the United States for distribution.
3            "Overt Acts
4            "In furtherance of the conspiracy and to
5  accomplish its object, on or about the following dates,
6  defendant Camargo, together with others known and unknown
7  to the Grand Jury, committed and caused to be committed
8  various overt acts in the countries of Panama and Colombia
9  including, but not limited to, the following:
10           "1.  On October 13, 2017, using coded language in
11 electronic communications, defendant Camargo discussed the
12 price of drugs in Colombia with Co-conspirator 1.
13           "2.  On October 26, 2017, using coded language in
14 electronic communications, defendant Camargo asked
15 Co-conspirator 1 if Co-conspirator 1 was ready to transport
16 drugs from Colombia.
17           "3.  On November 9, 2017, using coded language in
18 electronic communications, defendant Camargo and
19 Co-conspirator 1 agreed to delay a shipment of drugs from
20 Colombia to Panama due to increased law enforcement
21 activity around Panama.
22           "4.  On November 13, 2017, using coded language
23 in electronic communications, Co-conspirator 1 informed
24 defendant Camargo that Co-conspirator 1 had obtained
25 cocaine in Colombia and that Co-conspirator 1 was waiting

1   to object marijuana in Colombia before shipping both the
2   cocaine and marijuana from Colombia to Panama.
3           "5.  Between November 13 and 15, 2017, defendant
4   Camargo arranged for other co-conspirators to transport by
5   boat from Colombia to Panama the cocaine and marijuana that
6   defendant Camargo had discussed with Co-conspirator 1 on
7   November 13, 2017.
8           "6.  On November 15, 2017, using coded language
9   in electronic communications, defendant Camargo told
10  Co-conspirator 1 that the intended route for the drug-laden
11  boat on which defendant Camargo's co-conspirators were
12  planning to transport cocaine and marijuana from Colombia
13  to Panama was free of law enforcement.
14          "7.  On November 16, 2017, using coded language
15  in electronic communications, Co-Conspirator 1 told
16  defendant Camargo that the drug shipment would occur that
17  day and suggested that defendant Camargo not use his phone
18  to communicate with Co-conspirator 1 during the shipment in
19  order to avoid law enforcement detection.
20          "8.  On November 16 and 17, 2017, co-conspirators
21  acting on behalf of and at the direction of Camargo
22  transported cocaine and marijuana from Colombia to Panama
23  aboard a boat and buried the drugs in Panama.
24          "9.  On November 17, 2017, using coded language
25  in electronic communications, defendant Camargo told

1  Co-conspirator 1 that the boat carrying the drug shipment
2  had arrived safely that morning in Panama.
3            "10.  On November 18, 2017, using coded language
4  in electronic communications, defendant Camargo told
5  Co-conspirator 1 that law enforcement had located the boat
6  that had been used to transport drugs from Colombia to
7  Panama.
8            "11.  On November 21, 2017, using coded language
9  in electronic communications, defendant Camargo discussed
10 with Co-conspirator 1 the fact that law enforcement had
11 recovered the buried cocaine and marijuana that defendant
12 Camargo and Co-conspirator 1 had arranged to transport from
13 Colombia to Panama.
14            "12.  On January 25 and 26, 2018, using coded
15 language in electronic communications, defendant Camargo
16 discussed with Co-conspirator 1 another shipment of
17 cocaine.
18            "13.  On May 30, 2018, defendant Camargo met with
19 Co-conspirator 1 in Panama and discussed future shipments
20 of cocaine."
21            That concludes the reading of the indictment.
22            The indictment contains, as I said, one count
23 charging the defendant with a violation of 21, United
24 States Code, Section 963.
25            Would any member of the Grand Jury like me to

1   read the applicable statute?
2           I see no hands.
3           Would any member of the Grand Jury like me to
4   read the elements of the offense?
5           I see no hands.
6           Again, I'll just advise the Grand Jurors that
7   probable cause should be determined based on the witness
8   testimony and any supporting exhibits.  We don't have any
9   exhibits likely today.  Again, you have a right to see the
10  witness in person.  If you wish to discuss that, let me
11  know, but if not, I'll assume you're fine with the witness
12  testifying as we have it set up here in this other room.
13          Any questions before I bring in the witness?
14      THE FOREPERSON:  No questions.
15          (The proceedings end at 10:39 A.M.)
16
17
18
19
20
21
22
23
24
25

```
1   STATE OF CALIFORNIA  )
                         )  ss.
2   COUNTY OF LOS ANGELES)

3

4         I, SHERYL WILLIAMS, CSR No. 7453, hereby certify

5   that the foregoing is a true and accurate transcript, to

6   the best of my skill and ability, from my stenographic

7   notes of this proceeding.

8

9         IN WITNESS WHEREOF, I hereunto subscribe my name

10  this 17th day of September, 2020.
```

*Sheryl Williams*
_____
Certified Shorthand Reporter in
and for the County of Los Angeles,
State of California

```
 1                    FEDERAL GRAND JURY

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                       UY GRAND JURY

 4            DOCKET NO. 012-027-JA-OY4-20-GJ

 5

 6        Proceedings had before the Grand Jury

 7        of the United States of America, in and

 8        for the Central District of California,

 9        at the United States District Courthouse,

10        312 North Spring Street, 13th Floor,

11        Los Angeles, California, commencing

12        at 10:39 A.M., on Tuesday, September 1, 2020.

13

14   PRESENT:

15        Ben Balding
          Assistant U.S. Attorney
16

17   THE WITNESS:

18        Efrain Estrada

19

20

21

22   REPORTED BY:  Sheryl Williams, CSR NO. 7453

23

24

25
```



20  Q   And the indictment talks about someone named
21  Co-conspirator 1.  Are you familiar with that person?
22  A   Yes, I am.
23  Q   Is that person someone who has been charged with
24  a drug-related crime in this district and has agreed to
25  plead guilty and cooperate with the government?

```
 1        A    Yes.
 2        Q    Did you or other agents meet with him in person
 3   on multiple occasions to talk about his role as a drug
 4   trafficker?
 5        A    Yes, we did.
 6        Q    In the course of those interviews, did he talk
 7   about the defendant Camargo-Clark?
 8        A    Yes.
 9        Q    That's named in this case?
10        A    Yes, we did.
11        Q    Is it your understanding that that person
12   identified as Co-conspirator 1 is cooperating in the hopes
13   of receiving a reduced sentence in his case?
14        A    Yes, he is.
15        Q    Now, a lot of the evidence in this case is also
16   based on intercepted Blackberry messages that the Colombian
17   National Police intercepted in the course of the
18   investigation?
19        A    Yes.
20        Q    Have you reviewed a number of those intercepts
21   that are discussed in the indictment?
22        A    Yes, I have.
23        Q    Did Co-conspirator 1 confirm that the intercepts
24   between he and -- that he was the person using the
25   Blackberry message that was speaking to defendant
```

```
 1   Camargo-Clark as discussed in the indictment?
 2        A    Yes, he did.
 3        Q    Did he confirm that Camargo-Clark was the person
 4   with whom he was discussing?
 5        A    Yes.
 6        Q    Did he identify a photograph of Camargo-Clark?
 7        A    Yes, he did.
 8        Q    Now, going through the indictment, I'll just
 9   briefly go through.  Based on your review of the Blackberry
10   messages and discussions with Co-conspirator 1 and other
11   investigation, was Co-conspirator 1's role to obtain
12   cocaine in Colombia that could be further distributed?
13        A    Yes, it was.
14        Q    Did he then sell some of that cocaine to Camargo
15   who would then transport it to Panama by boat?
16        A    Yes, he did.
17        Q    Did they do this on multiple occasions according
18   to Co-conspirator 1?
19        A    Yes.
20        Q    Now, when Camargo would transport it by boat, did
21   he get other individuals to man that boat to take it from
22   Colombia to Panama?
23        A    Yes.
24        Q    He didn't personally transport that cocaine; is
25   that correct?
```

```
1       A    No, he did not.
2       Q    And did the people taking the cocaine to Panama
3  then hide the cocaine in Panama so it could be further
4  distributed after that?
5       A    Yes, they did.
6       Q    Would Camargo then arrange to have the cocaine
7  transported from Panama up north through Central America
8  and ultimately to the United States according to your
9  investigation?
10      A    Yes, he did.
11      Q    Did you speak with someone who's familiar with
12 the drug routes that are taken by Colombia based and Panama
13 based drug traffickers in this case?
14      A    Yes, I did.
15      Q    Is the route -- is the value of the drugs in the
16 United States such that he believes that that's where a
17 drug shipment of the size discussed in the indictment would
18 have been headed?
19      A    Yes.
20      Q    Were there also markings on some of the drugs
21 that were found in this case that are consistent with drugs
22 that have been found shipped to the United States?
23      A    Yes, there were.
24      Q    In talking with Co-conspirator 1, was it also his
25 assumption that the drugs were headed to the United
```

1  States?
2      A   Yes.





12        Do any Grand Jurors have any questions?

13        A JUROR: Co-conspirator No. 1 when he or she was

14   purchasing the narcotics, where was that person at

15   physically? Do you know? As in United States soil or

16   elsewhere?

17        MR. BALDING: Right.

18        Q   I'll ask it this way. Co-conspirator 1, where

19   was Co-conspirator 1 based during all of this time before

20   Co-conspirator 1 was arrested in Panama?

21        A   He was in Colombia.

22        MR. BALDING: Does that answer your question?

23        A JUROR: Yeah. One more question. What does

24   this -- these narcotics sales have anything to do with the

25   United States other than it's suspected that it was going

```
 1   to make it eventually at one point to the United States?
 2        MR. BALDING:  I'll read you the indictment language
 3   again.  Specifically it's conspired with others, and the
 4   language is that they conspired to distribute at least five
 5   kilograms of a mixture and substance containing a
 6   detectable amount of cocaine intending, knowing, and having
 7   reasonable cause to believe that such substance would be
 8   unlawfully imported into the United States.
 9            For your determination, I'll just advise the
10   Grand Jurors that, you know, the threshold of probable
11   cause is whether or not there's sufficient evidence
12   presented to the Grand Jury that there's probable cause
13   that Camargo would have had reasonable cause -- intended,
14   known or had reasonable cause to believe that the substance
15   would be unlawfully imported.  I can ask a few clarifying
16   questions to the agent if that would be helpful.
17        A JUROR:  No.  That should be good.
18        MR. BALDING:  I'll just ask one further question.
19        Q   Is part of your understanding in talking to the
20   expert, the DEA agent that's experienced in the drug
21   trafficking trade from Colombia and the value of the goods
22   of the cocaine in the United States, is part of his
23   understanding based on Camargo's role, not just in this
24   transaction but in a larger drug trafficking organization?
25        A   Yes.
```

1   Q   Is Camargo in such a role as the head of a drug
2   trafficking organization in Panama that he reasonably knows
3   where the drugs are headed when they get to Panama?
4   A   Yes, he does.
5   MR. BALDING:  Any other questions?